Case No. 16-5358 et al., Safari Club International et al. Appellants v. Ryan Zinke in his official capacity as Secretary of the U.S. Department of the Interior et al. Mr. Burden for the Appellants, Mr. Kumpfer for the Appellees. Mr. Burden. Good morning, Your Honors. Doug Burden for Appellants, Safari Club International, National Rifle Association of America. With me at council table is Chairman Clare of Safari Club, Michael Jean of the NRA. Reserve two minutes for rebuttal. I'd like to address two issues that relate to how the service made these determinations and the standards that they applied. That being the Section 9C2 presumption and the question of ensuring survival versus enhancing survival. Regarding 9C2, I want to be perfectly clear about what we are arguing here because there seems to be some confusion in the district court and by the federal government. We are arguing that the Section 9C2 presumption applies such that the service must determine that the harvest of elephants for importation enhances the survival of the species. That's because the statute says that this presumption, the statutory presumption, applies to regulation under the ESA also, such as the elephant special rule. We are not arguing that Section 9C2 prevents the service from enacting a special rule under Section 4D. We are not arguing that 9C2 overrides any such special rule. We are not arguing that Section 9C2 conflicts with Section 4D of the ESA. And we are not arguing, as Safari Club did in 1993, that Section 9C2 exempts or preempts Section 4 or creates a conclusive presumption of importability. What we are arguing is that Section 9C2 applies after the service has enacted a special rule and sets out conditions for importation. We are arguing that the service must overcome that presumption as applied to those conditions in the special rule. And we are arguing that the service has never overcome this presumption. It did not do so in 1997 when it enacted the special rule. It did not do it in 2014 or 2015 in these enhancement findings when the service said only that it was unable to find that the hunting of these species enhanced the species, enhanced the survival of the species. They never affirmatively found that hunting did not enhance the survival of these species. And the record is full of references to being unable to make these findings based on a lack of information. The service's own statements admit that they could not rebut the presumption from the May 2014 Federal Register notice. They said, however, we recognize that our inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species. In their opposition brief here in this court, in asserting that they actually asserted that they overcame this presumption, even in that brief they say the 2014 and 2015 enhancement decisions explained, based on substantial evidence, why the service could not find that importing trophies of elephants killed in Zimbabwe enhanced species survival. What they've never been able to say and what the presumption requires them to find is that the service found that hunting does not enhance survival. This fundamental error undermines all or requires the vacating of all three findings and remanding for a proper decision. Turning to the question of ensuring survival versus enhancing survival, sometime between the earlier findings that they made for Zimbabwe and Tanzania, which they made for 15, over 15 years, in the current findings, the service started requiring that the harvest of these animals, something like ensure the survival of the species. And where did they do that in this case? In the July 2014 and March 2015 findings, after noting bright spots of conservation, they said there are not enough of these bright spots to overcome the problems currently facing Zimbabwe's elephant populations. That's at JA530. Where did they adopt this heightened standard that you're accusing them of doing that is not just enhance but ensure survival? Where did they do that? Well, they're talking about something like overcoming all the problems facing the species. That to me is something more like needing to ensure that all the problems are there. Why couldn't that just as easily be enhance? Well, I think enhance is... I take it with your answer, there isn't any place where they say that they're seeking evidence that this will ensure the survival. That language is not in there, is it? No, I'm looking at all the references in the findings of what they required. What they had said earlier, they acknowledged this regarding Tanzania, but I think it applies equally. They acknowledged problems, but they didn't make a negative finding just because there was problems. If they want there to be no problems, Zimbabwe is never going to not have problems with elephants. The question is whether the hunting and the benefits it creates, that we've outlined in our brief, creates a benefit. That's more what they said they had done before with Tanzania. They said despite reports of poaching and other wildlife management issues, available information had indicated that legal sport hunting within declared quotas was not causing a problem, and because of revenues generated by sport hunting, had the potential to provide conservation benefit to the species. That's at JA 479. That's more like enhancing. It's never going to solve all the problems, but does the hunting create benefits that enhances survival? Turning to the findings themselves, in April 2014, the service admitted that its finding was based on a lack of information. One of the key pieces of information that they did rely on was its conclusion. This was their language, quote, the elephant population in Zimbabwe in 2007 was 84,416 elephants, but as of 2013, that population had been reduced to 47,366. This conclusion was wrong because the report they relied on simply said that the survey results, or the relative reliability of the survey results, had dropped to 40,000 elephants, not that the actual population had dropped. In contrast to the 66,000 elephant figure from the positive 1997 finding, the actual population figure suggested by the International Union report was something over 85,000 elephants. Another key mistake was their reliance on reports. I'm sorry, the 85,000 figure includes the speculative figure? Yes. So how can you say that they're categorizing these as speculative, 45,000 of them are speculative? Right. How can we say that there are more than 80,000 elephants if half of the number is characterized as speculative? Those survey results, the way that the International Union classifies them, it's based on the method and how the age of the surveys, but it's not an indication that they believe that the elephants were not there. It's just that the information is lacking somewhat to be more certain that they're there. Well, when somebody says something is speculative, that suggests they don't know whether they're there or not. Isn't that a fair description of speculative? Because they have another column called possible, and speculative is lower than possible. Right. And they have another column called probable, and both possible and speculative are lower, and they have another column called definite. Right. So is it unfair to figure that the speculative means they don't really have any idea whether they're there or not? I think it means that the results are less certain than other results, but I think it's- All those things. Right. But what we know is that, in fact, those elephants were still there because in 2015, the service got results of the elephant aerial survey, very solid, reputable survey, comprehensive. It showed that $85,000 elephant figure was accurate. And so, yeah, it's just how the international union chooses to convey the information about survey results. But it was unreasonable to conclude that that figure had dropped to 40- actual elephants on the ground had dropped to 47,000. They acknowledged this point in a subsequent finding, right, that this was a question of how many definite elephants there were? Right. In the July finding, they talked about the reliability of the survey, and they did not say that the figure, the actual elephants, had dropped to 47,000. The second error in the April finding related to the incident of elephants being poisoned in Wangi National Park, where the service, despite having months to try to verify the information between when it was reported and when they made a decision, simply accepted that 300 elephants had been poisoned when the actual figure, it turned out, was around 100, certainly still a tragic occurrence. But to put that error in perspective, 200 elephants is 40% of the total hunting quota for the year and likely a much higher percentage of the actual hunting offtake. Again, that was the best evidence they had at the time, and they acknowledged that in the subsequent finding, that it was only 100, right? Well, I think there was, if they had looked, I think there was, they relied on media accounts and did not try to find out, as far as we know, whether that was an accurate figure, and they had months to do so. As this occurred in December 2013, they made their decision in 2014. So they just relied on it. It seemed like they wanted to bolster that April finding because it really wasn't that much different from the 1997 finding. If you compare the two, a lot of similarities. They just said, we have a problem with the population, we have this horrible poaching incident, 300 elephants, and that was the main difference between a positive and a negative finding. Neither one was justified. Are you saying that the regulation with the elephant rule was unlawful under the statute? No. The 4D rule? Yeah. Doesn't it overcome the presumption? They have to make a determination. If they don't make it, it's not made, for whatever reason. No, the 4D rule sets out the condition, and it is a regulation under the ESA, sets out conditions for importability, including that there be an enhancement finding. And the statutory presumption in 9C2 applies to that regulation. That's the language of 9C2. E6-1B? I'm sorry? E6-1B on sport hunter trophies? May not be imported? Provided the determination is made? Right. Yes, the presumption applies to that. So that the service should have presumed that enhancement was that the harvest of the elephants enhanced the survival of the species. They could have overcome that presumption by making a factual finding that the hunting of those elephants did not. But 6B says that may be imported if a determination is made. You're talking about the... African elephant sport hunter trophies may be imported into the United States provided the determination is made that the killing of the trophy animal will enhance. Right. They didn't make the determination. I know. They should have presumed... That's what I'm saying. If I read that regulation to indicate how we deal with what you call the statutory presumption. The presumption is nothing more than a statute. And the regulation seems to suggest, you know, it exists but on these terms. Determination has to be made. There was no determination made. And they explained why they weren't making a determination. They didn't have the evidence to do it. So they didn't make it. So you've overcome the statutory presumption. The presumption isn't locked in. It's nothing more than a presumption. That's why I'm wondering, do you think the regulation is unlawful? I think the regulation... I don't know how else to read it. It essentially says the presumption doesn't mean anything more than this. There has to be a determination that the killing of trophy animal will enhance the survival. They didn't make that determination. And for good reason. The presumption applies so that they have to, as a starting point in their analysis, presume that the harvest of those elephants ensures...enhances the survival of the species. So you're saying the regulation is unlawful? Well, as applied here, yes. Not in all circumstances. It still applies to Appendix 1 elephants, and it's valid as to them. So you're saying the only time the regulation is lawful is when they make the determination? If they make a determination that overcomes the presumption. I don't know what that means. It says you can't import unless they make a determination that the killing of the trophy animal will enhance the survival. And they haven't made that determination, and they did. And I can understand an argument that, well, that determination was bogus, and they didn't have any justification for it. But they did have a justification for it. They said they could not make that determination. Congress, in Section 9C2, said whatever the conditions are, whether they're in the ESA, whether they're in a regulation, you shall presume that that import is valid. I understand your argument. I take it that when they adopted the special rules, and when they adopted the regulation that says the presumption is overturned when there is a special rule, they say it's based on the rulemaking record and our administrative finding. So why wasn't the administrative finding with respect to this special rule sufficient? After all, a presumption is only a burden of going forward. It's not a burden of proof. And all you have to do is have a reason that explains why the presumption doesn't apply. Their reason is there isn't enough evidence to establish this in these circumstances. Why isn't that enough to overcome the presumption? Well, we are arguing that that regulation, as applied in this situation, must give way to the statute. But when they adopted the special rule with the enhancement finding in 97, a couple weeks before they made that finding, I mean, they made that regulatory change, they had made a positive enhancement finding for Zimbabwe elephants. They had found, as a matter of fact, that the harvest of these elephants, or importation, enhanced the survival of the species. So I don't see how you can make a factual finding that it does enhance the survival of the species, and then five weeks later, by adopting a special rule to which the presumption applies, say that actually harvesting these elephants does not enhance the survival of the species. We have a factual finding that it did, and the presumption applies to that rule. So I think the CERN is just wrong in that regulation that says that the mere adoption of a special rule. Mere adoption with the record of the special rule. The record was mainly about being consistent with the CITES requirements, that earlier the CITES requirement was that there had to have been an enhancement finding made by the importing country. That was mainly what they were doing in that rulemaking. That rulemaking said nothing about Zimbabwe elephants, much less any other elephants, the actual on-the-ground conditions, and about whether hunting enhanced the survival of the species. That finding had been made five weeks earlier as a matter of fact. Other questions? No. Thank you. Thank you. May it please the Court. Avi Kupfer for the Federal Appellees. With me at Council's table is Russell Hewson with the Solicitor's Office of the Department of the Interior, and Courtney McVane, who is representing the intervenors, and is prepared to answer any questions that the panel has specifically for the intervenors. To pick up where Council left off, the word presumed in Section 9C2, there's nothing in Section 9C2 that supports the view that the only way that the Fish and Wildlife Service can overcome that presumption is with an affirmative finding to the contrary. As you mentioned, Chief Judge Garland, that would shift the burden to the Fish and Wildlife Service and essentially enforce a dramatically different view of the Endangered Species Act that puts the onus on the Fish and Wildlife Service when it wants to protect threatened species by promulgating conditions regarding their import. Presumed implies the ability to rebut, and there's nothing in the language of Section 9C2 that cabins the means by which the Service can rebut that presumption. Here the Service did so in 1992 when it promulgated a special rule with an additional set of conditions. In addition to the predicates in Section 9C2 itself that a would-be importer has to meet before bringing a sport-hunted elephant trophy into the United States. That reading is further supported by the context in which it occurs. What is it in the 1992 special rule that rebutted the presumption, other than the fact that the rule was issued? Other than the fact that the rule was issued with an additional set of conditions, the Service said in the preamble to that rule that it only wanted to support sport hunting when it was done in a carefully regulated manner that aided in conservation, and it's repeated that same logic throughout the history of the special rule when it's made various administrative findings. In 1997, when the Zimbabwe African elephant population was transferred from Appendix 1 to Appendix 2, it reiterated that point, that despite the move from 1 to 2 under CITES, the requirements of the regulation continued to hold because the Service continued to believe it was important that sport hunting only be supported when it was conducted in a carefully regulated manner and it was connected to aiding in conservation in some manner. I think it's important to note here that the context in which 9C2 was promulgated, it's under this minor provision of the ESA that relates to, quote, violations of convention. That's the heading of the subsection. And the fact that the concern was violations of CITES is further corroborated by the legislative history. The House Committee Report states that the concern that Congress had was the presumed validity of CITES export permits. What Congress was telling the Fish and Wildlife Service to do was how to prioritize its time, not to spend too much time looking under the hood at presumably valid export permits from these countries. There's nothing in the language. I see the heading and I see Part 1, which is about the convention, but Part 2 just says any provision of this chapter or any regulation. It doesn't seem to be limited to export. And it doesn't seem to be limited to the convention. That's correct, Your Honor. I'm just simply adding context to the language. But I think the key point here is there's nothing in the language that cabins the means by which the service can rebut that presumption. And they had a rulemaking with a record that supported that rulemaking in 92. In 97 and 2000, when various African elephant populations were transferred from Appendix 1 to Appendix 2, it continued to find that the enhancement requirement was necessary to support the survival of those species. And in this particular case, there are 2014 and 2015 findings where the service offered extensive evidence for why it couldn't make that finding. When did you have the rulemaking required by the APA? That was not an adjudication. It was a rulemaking. When did you satisfy the requirements? In 1992. No, no. In this case. That's the problem with your case. Where's the rulemaking that's required by the APA? It's not an adjudication, in my view. So I understand what the lower court said. Respectfully, I don't think that flies, at least on this side of the bench. So where's the rulemaking? Let's assume I'm right. You had to engage in notice-and-comment rulemaking of some sort. When did you do that? Assuming you're correct, Your Honor. You have to assume that. There was no rulemaking. The 14 and 15 findings were informal adjudications. They were not... So you're just going to rest on that. You're conceding the point that if we say it's a rulemaking, you lose. It has to go back. No, Your Honor. If this Court were to find that the 14 and 15 findings were rulemakings, it would have to take note of the rule of prejudicial error. And in this case, even if they were somehow rulemakings in disguise, the Safari Club and the NRA haven't demonstrated prejudice at all. Did everybody get notice? Did everybody have an opportunity to comment? Yes, Your Honor. That Federal Register notice was to everyone? The Federal Register notice informed the public. But it only asked for comments from Zimbabwe. That's actually not correct, Your Honor. It's not? No. The quoted language in Safari Club's brief, they quote one part of the 2014 notice of the interim finding. But in another section of that notice, they asked for comment from the government of Zimbabwe and others. That's in... Well... Where is that in the record? Just could you show us? I know the July thing said they had asked for comments in the record. But where does the... Where is that in the... So that's in the Federal Register at volume 79, page 26987. The quote is, therefore the service is actively pursuing additional information from the government of Zimbabwe as well as other sources in an effort to make a final determination. So the act is actively pursuing from other sources? You think that's an invitation to comment? Yes, Your Honor. And in this case, we're dealing with sophisticated actors here. Safari Club, Conservation Force, various outfitters commented throughout the process. The record is... Well, that's certainly not your test, right? Sophisticated? No, I'm serious. That can't be the test. No, it's whether they provided notice. Right. My question is whether you provided notice to the public, anyone in the public who might have an interest in comment. That's right, and they did that in 2014 with the... twice, with the notice of the interim finding and the final finding. And Safari Club did comment. And nowhere has Safari Club demonstrated how it would have responded any differently. Did the NRA... NRA's a party. Did the NRA comment? Not to my knowledge, Your Honor. They assert in their brief that they didn't. That's correct. How do you... We have a case from 2002, I'm actually quite surprised it isn't cited here, called Sugar Growers v. Venom. Do you know that case? The Sugar Cane Growers case? Yeah, Sugar Cane Growers. Do you know that case? Yes, the district court cited the case. Yeah. We held there that the failure to do notice and comment was not harmless, even though there had been at least a dozen contacts between the agency and stakeholders, and even though the agency had made changes in response to those comments. And we held that under those circumstances it still wasn't harmless, that the failure to do notice and comment was an error that required vacating the rule. I think two responses to that, Your Honor. First is that not only was Safari Club in communication with the agency...  Right, they were provided notice at least twice through the Federal Register. And the second part of the test, even if that first part was satisfied, the second part of the test is that they demonstrate how they would have responded differently, how it would have swayed the agency. And they simply haven't done so here. Even if this panel were to find that the 14 and 15 findings were rulemakings, I would like to stress, though, that there's no regulation or statute that required the agency here to proceed via rulemaking. That choice lies with the agency in the first instance, nor does this bear... Who was on the other side of your perceived adjudication? Your Honor, there wasn't a specific party on that point. Well, that's his point. That's the point. It doesn't make any sense. Your notion that this was an adjudication is respectfully specious. It doesn't make any sense. Who was on the other side? An adjudication involves parties with respect to legal norms and trying to get a determination with respect to certain rights that are being pursued. I don't know who the other side is, and agencies can't just say we're announcing something, it's an adjudication. Well, respectfully, Your Honor, agencies oftentimes make informal decisions that aren't rulemakings without parties. No, I fully understand that. That just goes to what the requirements are under the APA, but I'm talking about an adjudication. Well, in this... An adjudication involves contesting parties. Well, here, I mean, this was a highly fact-specific determination, and we're dealing with a very specific... There's already rulemakings. And we're dealing with a specific case, the facts on the ground in Zimbabwe in 2014. The agency wasn't attempting to... But how can you have, just to pursue what Judge Edwards was asking about, fact-specific yes, intensely fact-specific yes, but who was the party in the adjudication? You don't have a party. That's correct, Your Honor. So how can you have an adjudication without a party? You're not arguing that Zimbabwe was the other party? No. To frame this in a slightly different way, in 2014 to 2015, there was no import permit required for trophies from Zimbabwe. And the implication of saying that there had to be another party, had to be a party on the other side, would essentially be this court telling the Fish and Wildlife Service that the only option it had was to proceed via a rulemaking. That may be the right answer. Yeah. That's probably right, isn't it? Why is that shocking? You got it. That's exactly right. Unless a party came in, for example, and said we want a permit, and now you're in an adjudication if the agency says give us your best shot, and the agency listens, and you're back and forth, and then a decision is rendered. There's no adjudication here, Counselor. Well, if that's the position that the panel takes, then, again, I'd like to stress that Safari Club, neither Safari Club nor the NRA, has demonstrated that they were prejudiced by the failure of the NRA. In the Sugarcane Growers case, we rejected that argument. I believe the facts of that case were somewhat different than most cases. Of course, facts in all cases are different. But the fact is, in that case, there was extensive comment, communications between the agency and stakeholders, and the agency made changes. I don't believe there was. And we still said that was inadequate, even though we rejected the argument that the petitioner had to show that he would have made an argument that he wasn't able to make. Respectfully, Judge Stigall, I don't believe there was the same level of notice in that case as the case here, and further, the appellants haven't demonstrated how they would have responded differently. Okay. With my remaining time, I'd like to briefly address the arbitrary and capricious challenges to the 2014 and 2015. I'll give you a little more time on that, but I do have a question about the argument about whether the April findings are moot. Right. So I must say I'm a little bit confused about this. The district court ruled that you were, you, the government, not you personally, were bound by an earlier agreement that there would be notice before anything went forward. And the court ruled that the April ruling was in violation of that, and the result was, and I'm just quoting, is that imports of trophies from elephants from April 4th to May 11th may proceed. And then at the end, the court says the court will order the effective date of the April finding is May 12th. But I take it the government is arguing that a later finding, maybe in July, I guess, somehow goes retroactively, goes back to April. Is that right? Goes back. I'm sorry. Goes back to April 4th. Well, the intent was to go back to April 4th, but with the court-imposed May 12th date, it would go back to May 12th. Oh, this was the part I didn't understand. So the government agrees that any trophies that were taken before May 12th can be imported? Correct. I see. Okay. So that's why you're saying it's moot. That's right, Your Honor. I see. So why do we have to discuss the April announcements at all if they are basically without effect? Well, the government's position is that we don't need to be discussing them. At all. I see. Okay. Thank you. Now go ahead and talk about the arbitrary purchases. I cut you off. Okay. I'll give you another couple minutes. Go ahead. Thank you, Your Honor. I just briefly wanted to state that all of the examples of areas where some of the information provided in those April findings turned out to be incorrect, like the Hawangue poisoning incident, all of these incidences were corrected in the final 2014 finding as well as the 2015 finding. So it's hard to see how Safari Club would be able to demonstrate prejudicial error from any of those small errors at the margins. But I think the bigger point here with the final 2014 finding and the 2015 finding is that it's not enough. What the service was telling the government in Zimbabwe was that it wasn't enough that someone came to Zimbabwe and paid for a hunt. The government in Zimbabwe had to help it connect the dots to find that killing that animal actually supported species survival, and it wasn't able to connect those dots when there was no management plan in place that had been updated since the year 2000 with any sort of measurable objectives. And it appeared to the service that the 100,000 elephant figure that Zimbabwe relied on year in and year out was outdated based on information coming in from the IUCN report as well as at CITES conference meetings in 2012 and 2013, which were indicating that there was a poaching crisis in Zimbabwe and the country was relying on outdated population data. So the driving force of those 2014 and 2015 decisions weren't one poisoning incident in Hoange National Park or whether the service could have been slightly more clear in the April finding when it was quoting the 43,000 number, which it corrected in the July finding and then the 2015 finding. It was really the lack of any serious management plan. The opposing counsel raised an aerial survey that was conducted in 2015. What's your answer to that? The Pan-Africans. Well, so two points to that, Your Honor. The first is that when those numbers came out, they came out before the 2015 finding, but the survey announced first that they were provisional figures, that they weren't final numbers. And second, the service responded to that in the 2014 and 2015 findings, actually anticipating the survey coming out and asking that the government in Zimbabwe incorporate those numbers into how it determined how many sport hunting permits it was going to offer in a given year. And, in fact, the government in Zimbabwe has been doing that. They've been continuing to work with the Fish and Wildlife Service, and there's a new management plan that is responding to that new information that has come out. Further questions? No. Thank you. Thank you. All right. I think Mr. Burton was out of time, right? On the other hand, I ran him over, so I'll run you over. Come on up, come on up. Run over is a long phrase. I agree. Thank you, Your Honor. I'll be very brief. Just on rulemaking, I don't want to belabor it, the April finding was a complete surprise to everyone. There was no notice, absolutely no notice. What about their point that it's moot because nothing, in light of the district court's order, which they didn't appeal, that nothing starts until May? Well, the April 4 finding still applies to elephants harvested from May 12th to July 31st. So it is still relevant for elephants harvested then. What they're arguing is that the April finding is moot because they said it is, because they said that the July one goes back in time. Obviously, if it's a rule, it can't go back in time. But they just – Well, I have a different question about the mootness. It doesn't have any effect, the April finding, because there wasn't any notice. So it doesn't start until the May 12th notice. Does the May 12th notice correct the problems that are in the April notice? It published the finding in the Federal Register, which the district court ruled was necessary before it went into effect. So up until May 12th, the 97 positive finding applies, and that's why they're allowing imports. But there's nothing in the April finding or the record that ever said, this is an interim finding that we're going to retroactively replace later in time. It said it's – Did the later finding initiate notice and comment rulemaking? The July finding? Either the May or July. Did any of them? Any of them, no. All they did was say, here's our decision, here's what we looked at, we're pursuing other information. That's all they did. Regarding the – real quick on the survey that came out in 2015, because they said it was provisional data, it does not mean it wasn't reliable or something they should have factored into their analysis. And the reason Zimbabwe didn't change their quota in response to it was because that was in the neighborhood of where Zimbabwe always thought their population was, and they had based their 500 elephant quota on what they thought, figures that turned out to be relatively accurate when the elephant survey came out. Let me ask you, if we assume that they can't prevail on harmless error and that a rulemaking was required, what relief could you get pursuant to a rulemaking if the court were to order it? What's left to be given as redress? Well, if you set aside the three findings because of lack of notice and comment rulemaking, the 1997 positive enhancement finding would go back into effect. No, no. I know where you want to go with that, okay? So let's not go there. What are we talking about in terms of redress for whatever harms you think you suffered for want of notice and comment rulemaking in this case? Well, the service would initiate a new rulemaking if it chose to do so to determine whether. . . And what is it that you could say and might get as a consequence? Are there any imports left to be had? Yes, yes. We'd want a positive enhancement finding which would apply to imports to the present day. What about for 2014? I'm talking about 2014. That's right. Are there imports left? Yes. I think the declarant that we cited too was Cheek. It's in the joint appendix. And there were hunts in those time periods, yes. Can I ask you the finding here, which we're debating about whether it required notice and comment, are there similar findings about other kinds of animals from other parts of the world? Yes. I mean, I know there are findings on elephants that are still in place. I'm less sure about other species. So if we were to say that this is not an adjudication as the district court held, we would be putting in question the validity of many other findings, not just this one. Is that right? I guess findings that could still be challenged. The 97 elephant, our Zimbabwe elephant finding was beyond the statute of limitations. Presumably it couldn't be challenged. Other enhancement findings, they tend to be long-term. So, you know, theoretically, yes, but I'm not sure of the impact. Well, it would depend upon whether or not, because in the last case that we had, one of the last cases that we had, the suggestion was made that individuals or organizations could pursue or must exhaust the request before the agency and get a determination. That's an adjudication. So I don't know that every prior case would be affected by a decision here, but this was an attempt at adjudication, which was really a rulemaking. I'm confused about what the agency needs to say in that score, because the last time I heard a case like that, it seemed to suggest individuals and organizations could come in and contest, and they would get an adjudication, and that would be the disposition. Okay, thank you. I would like to hear from the government just on this one fact point. What would be the con- If were the court to rule that this is not an adjudication and it required notice and comment, what other kinds of findings are there out there with respect to other animals and other places? And was there a reference to the statute of limitations? What is the statute of limitations? So there are a number of other findings with respect to other animals. For example, just in 17.40, the vicuña has a similar requirement that the agency find that the program in the country is supporting species survival. It's not clear that it would have an effect. Is a license required in that situation? In other words, could that have been an adjudication for vicuñas? I'm not sure what the answer is to that question, Your Honor. But here there has been, in mid-2016, the Fish and Wildlife Service promulgated a rule that does require import permits for all elephant trophies. It wasn't in existence when this litigation began. And to your point, Judge Edwards, the prior case you heard that emanated from the same complaint, it was with the Tanzania elephant population, and there was an import permit required for that population because it was on CITES Appendix 1. At that time, an import permit wasn't required for the Zimbabwe population because it was on Appendix 2. But as of 2016, import permits are now required under the ESA regs for all elephant trophies. And in fact, there are declarants. Some of the declarants in this case are currently running that administrative process, seeking permits for the 2015 elephant trophies that they have, presumably outside the United States somewhere that they're trying to bring in. Okay. Thank you very much. We'll take the matter under submission.
judges: Garland, Tatel, Edwards